## Davis et al. v. Smith.
### (Decided May 1, 1936.)

ROBERT J. WATSON and J. E. SAMPSON for appellants.

GOLDEN, LAY & GOLDEN and RICHARD PRIEST DIETZMAN for appellee.

OPINION OF THE COURT BY JUDGE STITES—Affirming.

This is an appeal from a judgment of the Bell circuit court based on the verdict of a jury in the gross sum of $6,000 in favor of appellee and against the appellants. There is little disagreement as to the essential facts. The appellee, Harold Smith, who sues by his next friend, was, at the time of the acts herein complained of, a child of four and a half years of age. During the evening of June 11, 1933, Harold was riding in the back seat of an automobile operated by his father, William Smith. Wilson Phipps, a boy of about fourteen, was with him in the back seat, and "Doc" Edwards was with the driver in the front seat. The group had just returned from an expedition up Cumberland Mountain, for the purpose of securing two gallons of moonshine whisky for William Smith, and were proceeding at an orderly rate of speed down Cumberland avenue, in the city of Middlesboro, when they encountered the appellants, Willard Davis and P. L. Perry, police officers of that city, who at the time were cruising about in a police car. The attention of the officers was directed to the automobile occupied by appellee by the fact that one of its headlights was not burning and it had no tail light, and they pulled alongside Smith to warn him of his delinquency in these particulars. Recognition of the occupants of each automobile was instant and mutual. Conscious of graver faults than missing lights, Smith accelerated his speed down Cumberland avenue, and thence down Fitzpatrick avenue, with the officers in pursuit. As the chase reached the overhead bridge on Fitzpatrick avenue, the cargo of liquor in the Smith car was "jettisoned," and thereupon the appellant Willard Davis opened fire with his pistol and fired a number of shots at his quarry. In something over a mile farther, the police car overtook and passed the Smith machine and compelled it to stop. It was then discovered that Harold had been seriously wounded by one of the bullets which Davis fired. This action was filed against the two policemen and their bondsmen to recover damages in the sum of $10,000, resulting from the injuries sustained. The jury found a verdict of $3,000 against each of the policemen and their sureties, and the court reduced the judgment against the sureties to the penal amount of $1,000 fixed in each bond.

The case was tried before Judge J. B. Hannah, sitting as a special judge of the Bell circuit court. There was no stenographic report of the evidence. On September 29, 1934, Judge Hannah entered an order overruling the appellants' motion for a new trial and giving them until the 10th day of the November term to file a bill of exceptions. Within the time allowed, appellants tendered a narrative bill supported by the affidavits of six bystanders. Judge Gilbert, the regular circuit judge, being doubtful as to his duty in the premises, passed the matter over, and on January 11, 1935, appellee tendered a narrative form bill of exceptions differing from that of the appellants only in that it extended and amplified the testimony of Dr. Charles P. Stacey, who was a witness in the case. With this bill of exceptions was filed an affidavit by Dr. Stacey certifying the correctness of the narration of his evidence. On January 25, 1935, Judge Gilbert entered an order reciting that he was uncertain of his duty in the matter, but filing both bills of exception as a part of the record. He signed neither bill, although, clearly, he should have done so (Civil Code of Practice, sec. 334). Appellants contend that the bill of exceptions prepared by appellee should not be considered because not filed in time. Appellee, on the other hand, has made a motion in this court to strike the bill of exceptions prepared by appellant on the ground that it has never been signed or approved by the lower court.

It is settled that an unsigned bill of exceptions will not ordinarily be considered, although filed in the record. Brineger v. Louisville & N. R. Co., 72 S. W. 783, 24 Ky. Law Rep. 1973; Louisville Bridge Co. v. Neafus, 110 Ky. 571, 62 S. W. 2, 23 Ky. Law Rep. 183, rehearing denied 63 S. W. 600; Wisconsin Chair Co. v. Columbia Finance & Trust Co., 60 S. W. 717, 22 Ky. Law Rep. 1374. If the trial judge refuses to permit the filing of the bill or to sign it, it has been held that the proper remedy is to apply to this court for a mandatory order requiring him to do so. Proctor Coal Co. v. Strunk, 89 S. W. 145, 28 Ky. Law Rep. 241. It has been held also that under such circumstances the appellant may prepare a bystanders' bill and bring it to this court and file it as a part of the record. Thompson v. Tyrie, et al., 200 Ky. 741, 255 S. W. 526;

Carter Coal Co. v. Love, 173 Ky. 49, 190 S. W. 481. In Striger v. Carter, 190 Ky. 319, 227 S. W. 448, 449, the court said:

"The failure or refusal of the lower court to sign a bill tendered in time will not deprive a litigant of his right of appeal. When the judge refuses to sign the tendered bill, the proper course for counsel to pursue is to prepare a bystanders' bill and have it certified. Commonwealth v. Hourigan, 89 Ky. 305, 12 S. W. 550 [11 Ky. Law Rep. 509]. Such a procedure is authorized by a fair construction of the Code provisions relating to this subject. The prevalence of a contrary rule would leave a party remediless when the trial judge refuses to sign any bill."

While these authorities recognize an application to this court for a mandatory order as the better practice, they have likewise considered bills of exception certified by bystanders, though for some reason not signed by the judge. Under the circumstances, therefore, appellee's motion to strike the bill of exceptions is overruled.

Considering next the claim of appellants that the bill of exceptions as tendered by appellee was filed too late (Civil Code of Practice, sec. 337), it will be observed that the order entered by Judge Gilbert did not actually file appellants' bill of exceptions until January 25, 1935, and that the same order filed the bill theretofore tendered by appellee, different only in the extension of the testimony of Dr. Stacey. Appellee had fifteen days after appellants' bill was *filed* within which to controvert its statements, and we conclude, therefore, that we may properly consider the narrative of Dr. Stacey's testimony as certified by his affidavit in appellee's bill of exceptions. It is not inconsistent with the statement as narrated in appellants' bill, but merely enlarges thereon.

Having concluded that we may properly consider the evidence in spite of the various technical objections, we are brought to the one remaining contention of the appellants, which is that the verdict aggregating $6,000 is excessive and was brought about as a result of passion and prejudice on the part of the jury.

The question of determining what damages are proper in a case of this character is always one of great difficulty. Strictly speaking, compensation for suffering or injury cannot be measured in terms of money. Damages are awarded as the only feasible means of making reparation or of giving indemnity for the wrong committed. The amount to be fixed is within the province of the jury, and, even though it be larger than we ourselves might have given, yet if, considering the whole case, we conclude that twelve sensible men could on the evidence reasonably have fixed the damages at the amount complained of, we should not interfere with their verdict. As said in Louisville Southern Railroad Co. v. Minogue, 90 Ky. 369, 14 S. W. 357, 358, 12 Ky. Law Rep. 378, 29 Am. Stat. Rep. 378:

"The opinion of a jury has been, and properly, no doubt, regarded as the best means of even a fair approximation, and every verdict should be treated *prima facie* as the result of honest judgment upon their part. They are the constitutional triers of the facts of a case, and courts should exercise great caution in interfering with their verdicts. Litigants must not be left, however, to their arbitrary will and be without remedy in cases where verdicts can be accounted for only upon the theory that they are the result of an improper sympathy, or unreasonable prejudice. In such cases it is one of the highest duties of a court to interfere; otherwise great wrongs will often result, and the party be remediless."

The instructions given by the court in the case at bar, to which no exception was taken, limited the amount of recovery to compensatory damages, although the pleadings and evidence admitted of a finding of punitive damages also. Our consideration, therefore, may be narrowed to the question of whether or not the verdict exceeds an amount which reasonably might be said to fall within the nebulous limits of compensation for the injury and suffering sustained.

The testimony indicates that the bullet injuring the child passed through the underside of the flesh of his left arm, thence into his chest, ranging downward

through the left lung, within about an inch and a half of the heart, into the lower part of the pleural cavity, from whence it was removed. The incision made for the removal of the ball was in the front of the chest at a point approximately five inches from the entering point of the bullet. Abscesses developed in the lung and in the pleural cavity, and it was necessary to maintain a drain in the wound to carry off the pus. The child was in the hospital for about two weeks, and remained under treatment for about five months. According to appellants' recital of Dr. Stacey's testimony,

"He stated that the child suffered a great deal of pain and was in a dangerous condition. When the child was brought to him he found there was a hole in the lung, and when the child breathed the air could be heard passing through this hole. He stated that this place was healed but that there was scar tissue which would not be so satisfactory as unimpaired natural tissue. He stated that it was problematical whether or not this scar tissue would or would not cause trouble in the future, or predispose the child to diseases of the lung, such as pneumonia or tuberculosis. He could not state this positively."

Dr. Stacey, as his testimony is extended by appellee, and certified by himself, also said,

"That there was, in his opinion, scar tissue in the lung and in the pleural sack around the lung caused by the bullet and also, caused by the abscess that had formed in the lung and the pleural cavity; he stated that this scar tissue was not as healthy or strong as natural tissue and that it would predispose the child to pneumonia and flu; it might and it might not; (that the pleural sack had adhered to, or grown to, the lung, and that the natural movement of the child's lungs in breathing would cause the lung and the pleural tissue to rub together) and that the extent of the expansion of the lung was limited because of the adhesions, which would predispose the child to tuberculosis and diseases of the lungs; that this lung was weakened because of the wound and abscess and adhesions and that it would be predis-

posed to various infections, more so than the normal lung, and that this was a permanent condition. He testified that he could not state that it would cause pneumonia or colds to develop in the lung, but that it was reasonably probable that it would, and that the child would be more likely to have these respiratory diseases than if the injury had not been inflicted, and that that lung would be more susceptible to these diseases than the other lung. He stated that the function of the lung was to assist in purifying the blood and that where this scar tissue was in the wounded lung, the circulation was restricted and that it could not perform its usual function at that point.''

Dr. C. K. Broshear testified as to the injuries and the pain and suffering, but did not undertake to express an opinion regarding the permanency of the impairment.

If the jury believed the testimony of Dr. Stacey, even as narrated by appellants, it is clear that they might reasonably assume that the facts described by him indicated a permanent and painful injury of a serious character. There is no particular magic in the words ''permanent injuries'' in a physician's testimony. If the facts attested by him are sufficient for a reasonable layman to conclude that the injuries are permanent, certainly we cannot say that the jury overstepped the bounds of reason in so concluding. Examination of Dr. Stacey's evidence as set out by appellee indicates even more strongly that the injuries were both permanent and of a serious nature. Furthermore, the child, while too young to testify, was exhibited to the jury, and the jury had the benefit of seeing for itself the scars and other results of the injuries. The verdict was large, but we are not prepared to say that it was excessive or that it indicates passion or prejudice on the part of the jury. It is only in those cases where the verdict is so palpably excessive as to strike us at first blush as being the result of some bye or sinister influence that we are authorized to set it aside. Chesapeake & O. R. Co. v. Honaker, 190 Ky. 125, 226 S. W. 394. This is not such a case.

Aside from the foregoing, it may be observed that the appellant sureties are in no way injured by the size

of the verdict beyond the $1,000 to which their liability was reduced. If we directed a new trial as to the appellant principals, they might quite properly be confronted with an instruction on punitive damages, as pointed out above, and an even larger verdict than the one here complained of might be rendered against them in addition to the amount we have here approved as merely compensatory. Under the circumstances, it is difficult to see how appellants have been substantially prejudiced by the verdict even if we concluded it was excessive.

Judgment affirmed.

Whole Court sitting.